plaintiff files in the record of this Court a written stipulation agreeing to accept $18,000 in lieu of the jury's verdict of $30,000, then defendant's motion for a new trial is refused. Otherwise, the motion for a new trial is granted.

LEHIGH VALLEY RAILROAD COM-
PANY, a Corporation,

v.

The UNITED STATES.

No. 49897.

United States Court of Claims.

April 3, 1957.

Richard D. Lalanne, B. J. Viviano and M. R. Warnock, New York City, on the brief, for plaintiff.

Paris T. Houston, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., Lewis A. Dille, Kensington, Md., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

PER CURIAM.

This case was heard by the Honorable Wilson Cowen, a trial commissioner of this court, who rendered a report of his findings of fact. By an order of the court dated February 10, 1956, the court, pursuant to Rule 45(c), directed Commissioner Cowen to submit recommendations for conclusions of law in the case. He has done so in the form of an opinion giving reasons and citing precedents. The court adopts the opinion and conclusions of Commissioner Cowen which are printed below and plaintiff's petition is dismissed and judgment is entered for the defendant on its counterclaim in the sum of $15,395.26.

Opinion by the Commissioner

During September, October, November and December 1942, the defendant shipped 238 cars of ammunition over the lines of plaintiff and its connecting carriers. The shipments were intended for export overseas from New York Harbor, but they were not originally consigned for export. Instead, they were consigned to the Raritan Arsenal at Nixon, New Jersey, which the Government used during the war period, both as a storage and shipping depot from which the ammunition was moved on barges to ships in New York Harbor, and as a control point for ammunition moving by rail to Caven Point Terminal on the New Jersey Shore, where the ammunition was loaded aboard ships and exported to foreign countries. The 238 cars were included in plaintiff's trains with cars containing other commodities consigned to the Perth Amboy, New Jersey, area, and were hauled by plaintiff to its Perth Amboy yards, which it used as a breakup and classification yard for cars containing freight consigned to Perth Amboy and Nixon. Plaintiff had previously delivered ammunition cars to the arsenal after first transporting them to the Perth Amboy yards, where the ammunition cars were separated from other cars in plaintiff's trains, but in July 1942, plaintiff was instructed not to deliver any more ammunition cars to the arsenal without first supplying requested information regarding each car and to hold the cars until the defendant gave disposition instructions. While the cars were held for orders short of destination at Perth Amboy, defendant diverted and reconsigned them to Caven Point Terminal at Jersey City, where the ammunition was

loaded aboard ships for export to foreign countries. To make delivery at Caven Point, it was necessary for plaintiff to backhaul the cars from its Perth Amboy yards over its Perth Amboy Branch to its main line at South Plainfield, and thence eastward to plaintiff's railroad station at Caven Point.

The question to be decided is whether the freight charges should be computed on the basis of a combination of rates from the various points of origin to Perth Amboy and from Perth Amboy to Caven Point, pursuant to the provisions of plaintiff's Special Services Tariff, or whether such charges should be computed at the through export rate from the points of origin to final destination, plus reconsignment charges, pursuant to the provisions of Curlett's tariff.

The diversion and reconsignment of railway freight is a practice widely followed and required in the conduct of modern business. Since it gives the shipper the advantage of fluidity and regularity of movement and often enables the carrier to relieve terminal congestion by holding the freight at points short of terminals, it is regarded as a commercial necessity. Consequently, it is a common practice for carriers to hold cars short of the billed destination upon the shipper's order and to permit reconsignment to a new destination upon payment of the through rate, plus a reconsignment charge, and such demurrage or storage charges as may be specified in the applicable tariffs. Detroit Traffic Association v. L. S. & M. S. R. Co., 21 I.C.C. 257; Central Commercial Co. v. L. & N. R. Co., 27 I.C.C. 114.

Plaintiff's Special Services Tariff, in effect during the time involved, here, sets forth the rules and charges that are generally applicable to the diversion and reconsignment of freight on plaintiff's lines, but that tariff specifically provides that it does not apply when diversion or reconsignment is made under the rules contained in Curlett's tariff.

Curlett's tariff states that its rules and charges apply to a list of designated stations, docks, and terminals on both the New York and New Jersey sides of New York Harbor. One of the stations so listed is "New York Harbor, N. Y.", and for explanation of this designation there is a reference to Items 515 and 520, which define the location of New York Harbor as the area within the free lighterage limits and extra towage limits prescribed in Rules A–20 and A–80 of the same tariff. Rule A–20, contained in Supplement 1 of Curlett's tariff and in effect at the time these shipments were made, specifies the free lighterage and floatage limits of New York Harbor and states that these limits include Perth Amboy, New Jersey, on Staten Island Sound. Since the reconsignments here were made at Perth Amboy, New Jersey, Curlett's tariff is clearly applicable to the shipments in suit. Plaintiff's argument that this tariff is inapplicable, because plaintiff had no arrangements for providing lighterage service at Perth Amboy and because Curlett's tariff prohibited the lighterage of ammunition, is untenable. Items 515 and 520 and other provisions in the tariff make it clear that the tariff applies to freight which is not to be lightered as well as to that for which lighterage is to be furnished.

Rule A–30 of Curlett's tariff sets forth the charges and conditions under which eastbound freight may be reconsigned and diverted, and Item 2663 of the rule states in explicit and unambiguous language that the export rate (the same rate charged when the freight is originally consigned for export), plus a specified reconsignment charge, applies to eastbound freight not originally consigned for export, provided it is ordered for export after the shipment arrives at points named in Note 16 of the tariff and provided further that the shipment has not passed from possession of the carrier. It is undisputed that the 238 cars in suit were eastbound freight and that they remained in the possession of the carrier from the dates of shipment until deliveries were made at Caven Point. Note 16, referred to in the above-mentioned rule, states that the points thereby covered are "South Plainfield,

New Jersey, and east thereof." Plaintiff contends that this provision of the tariff can only be construed to apply to points on its main line running directly through South Plainfield to its New York Harbor stations. A similar contention made with respect to tariff provisions comparable to those stated in Note 16 quoted above was rejected by the Interstate Commerce Commission in James B. Berry Sons' Co. v. B. & O. R. Co., 140 I.C.C. 406. There a shipment of petroleum was made from West Alexander, Pennsylvania, to Bradford, Pennsylvania, and the shipper claimed the benefit of rates in a tariff providing that Bradford was a destination to which the Rochester rates applied in connection with the following reference:

> "Bases herein provided will apply only from points on the Baltimore & Ohio Railroad (in Ohio, Indiana, and Illinois; also points in Pennsylvania west of Callery, Pa.)"

West Alexander is 52.8 miles west of Pittsburgh, Pennsylvania, on a Baltimore & Ohio line running southwesterly from Pittsburgh to Wheeling, West Virginia, while Callery is 30.5 miles west of Pittsburgh on another line of the Baltimore & Ohio running northwesterly from Pittsburgh to Youngstown, Ohio. West Alexander is some distance west of a north and south line drawn through Callery. In holding that West Alexander is geographically west of Callery and that the shipper was entitled to the rate applicable to points west of Callery, the Commission said:

> " * * * Defendants contend that the language of that restriction unmistakably implies that the points west of Callery, in order to be entitled to this rate, must also be upon the same line that passes through that point.
>
> "We have repeatedly found that where there is a reasonable doubt as to the meaning of a tariff provision it should be resolved against the maker and in favor of the shipper. If the carriers desired to restrict this rate so that it would apply only

from points located west of Callery on the line of the Baltimore & Ohio passing through Callery, it could have been done in clear and unequivocal language."

As stated in finding 4, Perth Amboy is east of a line running north and south through South Plainfield and is, therefore, geographically east of South Plainfield.

In support of its position, plaintiff has cited Red Cedar Shingle Manufacturers' Association v. C. B. & Q. R. Co., 41 I.C.C. 422, and other decisions to the same effect, including Northern Brokerage Company v. Director General, 60 I.C.C. 182. These cases held that , in the absence of special tariff provisions, the through rate authorized by a reconsignment tariff cannot be protected where the reconsignment is effected at a point not on the through route to which the rate applies or where a backhaul is made. After considering the provisions of the tariffs involved here and the facts and circumstances under which the defendant's shipments were reconsigned, it is concluded that these shipments fall within recognized exceptions to the principle announced in Red Cedar. In the first place, a comparison of the provisions in plaintiff's Special Services Tariff with those in Curlett's tariff demonstrates that, whereas the former tariff precludes the shipper from receiving the benefit of the through rate where the reconsignment involves a backhaul and also names stations and points on branch lines that will be considered directly intermediate to the main line for the purpose of protecting the through rate, Curlett's tariff makes no mention of backhauls, nor does it limit the application of the through rate to reconsignments based on directly intermediate points. Litman & Ossep v. Director General, 88 I.C.C. 199.

In the second place, Item 2663 of Rule A–30 of Curlett's tariff provides express authorization for reconsignment after the shipments have arrived at points named in Note 16. Since Perth Amboy, the point of reconsignment, is one of the points named in Note 16, it

must be concluded that the framers of the tariff intended to authorize the application of the through export rate where reconsignment is made at such a point despite the necessity of a backhaul.

■ Moreover, the principle announced in Red Cedar and other cases based thereon does not apply when the out-of-line movement or the backhaul is made for the convenience of the carrier. Included within this category is the handling of shipments that are not reconsigned in the same way as those which are reconsigned. Also included are out-of-line hauls which become necessary because of the carrier's movement of the cars to a classification yard. Railroad Operating Practices, 209 I.C.C. 775. The facts here show that the ammunition shipments made prior to July 1942 and not reconsigned were first transported by plaintiff to the Perth Amboy classification yard before delivery was made to the arsenal and that the carrier followed the same operating practice with respect to the shipments in suit that were thereafter reconsigned. The ammunition cars that were reconsigned, as well as those that were not, were included in trains with other cars containing goods to be delivered at Perth Amboy. Some of the other cars carried coal and oil to be transshipped from that location. Curlett's tariff contemplated that eastbound shipments could be reconsigned after arriving at South Plainfield or at any point east thereof, but because of the heavy wartime traffic, plaintiff's Perth Amboy yard was the only available area for the holding and storage of the shipments pending reconsignment. The Pennsylvania Railroad Company, which handled as many of the ammunition shipments as were transported by plaintiff, also followed the practice of holding the shipments consigned to Nixon short of destination until they were diverted to Caven Point.

Although defendant knew that the ammunition cars were being held at Perth Amboy, the defendant did not direct or instruct the plaintiff to hold them at that point. After the "hold-for-orders" instructions were issued in July 1942, plaintiff continued to move the ammunition cars to the Perth Amboy yards with the knowledge that most of them would be reconsigned to Caven Point. Although a backhaul of approximately eight miles from Perth Amboy to South Plainfield was required for the reconsigned shipments, a backhaul of about seven miles to Nixon was also necessary for those not reconsigned.

A readily understandable explanation of the fact that the reconsignment privileges and rates provided for in Curlett's tariff are considerably more favorable to shippers than those authorized in plaintiff's Special Services Tariff is found in the unique situation existing in the New York Harbor area. As pointed out in the Lighterage cases, 203 I.C.C. 481 and in State of New Jersey v. B. & O. R. Co., 245 I.C.C. 581, more than twice as much tonnage is exported annually through the port of New York than through the ports of Baltimore, Philadelphia, and Boston combined. The port is served principally by seven trunk line railroads extending to the west. These carriers include plaintiff and other railroads which are parties to Curlett's tariff. Because of the highly competitive situation, the rates on line hauls of 100 miles or more to all points in the New York Harbor area are the same regardless of whether the deliveries are made at the New Jersey terminals of the carriers or whether the shipments are lightered across the harbor. In view of the extensive area covered by New York Harbor (defined in Curlett's tariff), the competing carriers backhaul traffic in many instances in order to make deliveries at their New Jersey terminals. For example, the Erie Railroad Company backhauls traffic from its branch lines for distances as great as 49 miles from its terminals.

■ Plaintiff points to the general waybilling instructions contained in Items 1400 and 1410 of Curlett's tariff and urges that, since these shipments were originally waybilled to Nixon in-

stead of to Caven Point, Curlett's tariff does not apply to the shipments in issue. If this contention were correct, the re-consignment rules of the tariff would be meaningless. However, it is apparent from a casual study of Rule A–30 that one of the principal reasons for its inclusion in the tariff is to establish re-consignment charges for freight not originally consigned nor waybilled to the designated stations, terminals, and docks in the New York Harbor area.

■ Waybills are documents which are prepared by the carrier's agents. The provisions contained in Items 1400 and 1410 constitute instructions to the carrier's agents for the preparation of waybills on shipments moving both prior to and after reconsignment. These provisions are not be interpreted as imposing such a limitation or restriction on the reconsignment rules. It is well settled that waybills are mere incidents of transportation and do not determine the nature of the service (Western Meat Co. v. Director General, 78 I.C.C. 77), and that neither the manner of waybilling nor tariff provisions are conclusive as to whether the movement is separate or through, Sinclair Refining Co. v. Fort Worth and Rio Grande R. Co., 148 I. C.C. 582.

As an alternative contention, the defendant urges that Item 2110 of Curlett's tariff is applicable and that, under the provisions thereof, defendant is entitled to the benefit of the through rate without the payment of the reconsignment charges. It is unnecessary to discuss this contention at length, because both the title and the provisions of Item 2110 show that it is inapplicable to the shipments in suit. The same is true of Item 2045–A, which is relied upon in part by defendant in support of its primary position.

It is recommended that the court conclude as a matter of law that plaintiff is not entitled to recover and that defendant is entitled to recover the sum of $15,-395.26 on its counterclaim.

R. J. REYNOLDS TOBACCO COMPANY
v.
The UNITED STATES.
No. 254–54.

United States Court of Claims.
April 3, 1957.

